# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**24-339 consolidated with 24-340**


**STATE OF LOUISIANA**

**VERSUS**

**TYREK RANDALL**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2021-CR-226993-B
HONORABLE WILLIAM BENNETT, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\***


**ELIZABETH A. PICKETT**
**CHIEF JUDGE**


**\*\*\*\*\*\*\*\*\*\***


Court composed of Elizabeth A. Pickett, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.


**AFFIRMED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 6547**
**Lake Charles, LA 70606-6547**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT- APPELLANT:**
    **Tyrek Randall**

**Charles A. Riddle, III**
**District Attorney, 12th JDC**
**Anthony F. Salario**
**Assistant District Attorney**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PICKETT, Chief Judge.**

## FACTS

This case involved a gunfight between two groups. The first group included Tyrek Randall (the defendant), Stephon Moore,[1] Jarvis Moore, and Ralin Watson, while the second group included Marquelle Prater, Roney Fox, and Jekolby Fields. It was April 4, 2021, Easter Sunday. The defendant was visiting his grandmother who lived in Cottonport on Martin Luther King (MLK) Drive. The street was nicknamed "horseshoe" because it was "U"-shaped and curved through the neighborhood. The defendant's grandmother lived on the curve. Near her home was a path, "the cut," which trailed from one part of MLK Drive to the other side.

The sun was setting. The defendant's group was outside on the horseshoe listening to music and watching as cars, mostly filled with girls, passed around the bend. Eventually, they saw a white SUV with Roney Fox in its backseat flashing cash. Jarvis Moore told his group to "hit the cut," and as the SUV was making the curve, gunshots rang out.

Renell Watson was the brother-in-law of Jarvis Moore. Renell stayed behind as Jarvis, the defendant, and the others disappeared through the cut. He testified that he could not see the shooting but saw the flashing lights and heard ten to thirteen cracks of gunfire. According to him, the defendant had his hand tucked under his arms, not only when he left but when he returned as well. Renell did not see whether the defendant was holding anything in his hands. The defendant soon thereafter left in his car. The others returned to where Renell had been waiting. Only Stephon Moore was missing.

Since Stephon had the keys to the car, the group could not leave. Jarvis called his mother who arrived not long afterwards, and they drove around the horseshoe looking for Stephon. They went to the house of Stephon's father and then to the house

---

[1] At the sentencing hearing, the trial court stated that defendant and Stephon were half-brothers.

of Stephon's grandmother. It was there that Jarvis's mother left the group before continuing her search for Stephon.

According to Renell, the defendant sometimes carried an FN pistol that belonged to defendant's mother.

Jekolby Fields testified that he was driving an SUV that evening. When recounting the shooting, he said that as he was taking the curve on the horseshoe, he saw the defendant and "about four others" take the cut. He rolled his windows down. On completing the curve, gunshots rang out. He testified that he saw the defendant and Jarvis Moore firing their weapons. Fields ducked and hit the gas while his two passengers, Prater and Fox, returned fire. He then drove until he reached Fox's house. Fields never called the police. He testified that he was aware that the defendant and Fox were in conflict but denied this was the reason he had driven down MLK Drive.

Marquelle Prater testified people, including the defendant and Jarvis Moore, shot at him. He said he fired shots into the air, and Fox also fired. Prater stated he would take a plea deal after the defendant's trial, and it was his understanding he would not go to jail.

Roney Fox testified he pled guilty to aggravated assault with a firearm as a result of the events at issue. He also pled guilty to another aggravated assault with a firearm arising from a separate incident. He received probation as a result of his pleas. He denied firing a weapon on the day at issue and said he pled guilty to stay out of jail. He testified that the defendant did fire a gun. Fox was also questioned about a restraining order the defendant obtained against him. The defendant alleged Fox shot at him. That restraining order expired on October 22, 2020.

Ralin Watson pled guilty as a result of the events at issue and was sentenced to four years. He served his time and was released on January 3, 2023. He testified that multiple shots were fired, but he did not see the defendant fire a gun. He said he did not hear shots coming from the vehicle either.

Detective John Johnson indicated that the investigation revealed shots were in fact fired from inside the vehicle.

Trooper Chad Peavy, a detective with the Louisiana State Police, took part in the initial investigation. The crime scene was from 241 to 307 MLK Drive. Law enforcement found three .38 caliber casings on the road in front of 241 MLK Drive and one 5.7 X 28 casing, which was consistent with an FN-type firearm, near a mailbox by 307 MLK Drive. Later that evening, Stephon Moore's body was found in the driveway between 307 and 313 MLK Drive. Investigators determined that a bullet had pierced his skull. However, having found a pool of blood away from Stephon Moore's body, Peavy concluded that someone had moved the body. In addition, the state police examined a Chevy Equinox with roughly fourteen bullet holes in its exterior. Peavy testified that these holes were found in the back, the passenger side, the front bumper, and the windshield, but no shell casings were found inside the vehicle.

Police executed a search warrant at the home of the defendant's mother. Her FN pistol, which she usually kept in her car, was not present at that time. She had turned the pistol over to her attorney the day she hired him. The attorney then gave the pistol to police.

Michael Stelly, an expert in firearms identification, and John Johnson, Mansura Chief of Police, testified that one 5.7 X 28 cartridge case found at the scene was fired by an FN pistol submitted to the crime lab by police.

Deriona Harris, who had a child with Stephon, testified the defendant texted and called her several months after Stephon's death. They had four conversations. During the last conversation, the defendant said he shot Stephon, but it was an accident. Harris testified this occurred in 2022, and she did not provide information regarding the defendant's contact with her to police and deleted the exchanges from her phone.

3

On June 1, 2021, defendant, Tyrek Randall, was charged by bill of information filed in trial court docket 226993 with attempted second degree murder, a violation of La.R.S. 14:27 and La.R.S. 14:31.[2] The defendant was also charged on the same date by bill of information in trial court docket number 226994 with illegal use of weapons or dangerous instrumentalities, a violation of La.R.S. 14:94.[3] In a separate trial court docket number, the defendant, Jarvis Moore, Prater, Fox, Fields, and Ralin Watson were charged with the negligent homicide of Stephon Moore.[4] An "Expedited Motion for Consolidation" was filed by the defendant on September 29, 2023, alleging all charges stemming from an incident on or about April 4, 2021, should be consolidated and tried together. The motion was granted on October 12, 2023.

Jury selection began on November 14, 2023. On November 16, 2023, the defendant was found guilty of the responsive verdict of attempted manslaughter, a violation of La.R.S. 14:27 and La.R.S. 14:31, and of illegal use of weapons or dangerous instrumentalities. The defendant was found not guilty of negligent homicide. On December 12, 2023, the defendant was sentenced to serve twenty years at hard labor for attempted manslaughter and two years for illegal use of a weapon or dangerous instrumentality, to be served concurrently. A motion to reconsider sentence was filed on December 27, 2023, and denied at a hearing held on January 23, 2024. A notice of appeal was filed on January 11, 2024.

The defendant is now before this court asserting two assignments of error: 1) defense counsel rendered ineffective assistance during trial and at sentencing; and 2) his sentences are excessive.

---

[2] Co-defendant Jarvis Moore was also charged therein, and the victims were listed as Marquelle Prater, Roney Fox, and Jekolby Fields.

[3] Jarvis Moore, Marquelle Prater, Roney Fox, and Jekolby Fields were charged therein with the same offense.

[4] Jarvis Moore, Prater, Fox, Fields, and Ralin Watson were also charged with the negligent homicide of Stephon Moore.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, defendant contends his defense counsel rendered ineffective assistance, giving five reasons. First, he contends his counsel failed to request a "great caution" jury charge. Second, his counsel failed to object to the incomplete, incorrect, and misleading jury instruction defining attempted manslaughter. Third, counsel failed to object to the late appointment of the Public Defender's Office to his case or to request a continuance to gain time for reviewing his case and trial. Fourth, counsel failed to object to the manner and extent the court questioned the jury about alleged jury tampering during deliberations. Last, the defendant contends his counsel failed to object to the court's consideration of improper victim impact statements at sentencing.

*Relevant Law*

Ineffectiveness of counsel requires a showing of both deficient performance by counsel and prejudice to a defendant's case. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Generally, a claim of ineffective assistance of counsel is relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. *State v. Miller*, 99-192 (La. 9/6/00), 776 So.2d 396, *cert. denied*, 531 U.S. 1194, 121 S.Ct. 1196 (2001). The benchmark for judging a claim of ineffectiveness is whether the attorney's conduct so undermined the proper functioning of the adversarial process that the trial cannot be considered to have produced a just result. *Strickland*, 466 U.S. 668.

*Great Caution Jury Instruction*

The defendant was charged in the bill of information alleging attempted second degree murder, and Roney Fox, Jekolby Fields, and Marquelle Prater were listed as victims. The bill charging the defendant with illegal use of weapons also charged Jarvis Moore, Marquelle Prater, Roney Fox, and Jekolby Fields with that offense.

The defendant notes that the state relied on the testimony of Fox, Fields, and Prater, the persons in the SUV, to show the defendant fired at them first, and the only physical evidence that he participated in the exchange of gunfire was one spent casing from an FN firearm that was owned by the defendant's mother. As for the defendant's group, Renell and Ralin Watson were the only witnesses to testify to the defendant's involvement. Renell testified he saw the defendant take the cut but did not see whether the defendant had a weapon, and Ralin testified that while he fired at the SUV, he never saw the defendant shoot.

He contends that the testimony of Fox, Fields, and Prater was critical to the state's effort to prove he was armed and fired at the SUV. These individuals, however, had a strong incentive to blame him and his friends for starting the gunfight. The defendant notes that various witnesses on cross-examination asserted that he reacted to being fired upon by Fox and friends. Although the defendant concedes that the single casing recovered by police and the Watson brothers' testimony may have placed him in the area of the shooting, this did not establish whether he acted in defense or aggression.

Even though the court gave the jury a general charge concerning the credibility of witnesses and the reasons they may have had to testify for or against the defendant, he contends that the court's charge failed to provide sufficient guidance. This guidance, says the defendant, would have perhaps been sufficient if it concerned the credibility of a co-defendant's testimony given in exchange for a plea agreement and

which had no corroboration other than the antagonistic testimony of Fox, Fields, and Prater who, again, had incentive to shift the blame.

The defendant notes trial courts are required to instruct the jury to regard an accomplice's testimony with "great caution" when said testimony is uncorroborated, but such an instruction is not mandatory when the accomplice's testimony is materially corroborated. *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749, *cert denied,* 528 U.S. 893, 120 S.Ct. 220 (1999). Material corroboration requires evidence confirming material points in the accomplice's testimony and evidence confirming the defendant's identity and some relationship to the situation. *Id.*

The defendant says, "In *Castleberry*, several other factors tied the defendant to the crime, including his own admission, video evidence placing him near the scene, a withdrawal from an ATM in the amount mentioned by Castleberry, and the selling of items that belonged to the victim." With that, he contends that the issue in his case was not whether he was present or whether he fired a gun but whether he fired in response to being shot at. Because the only corroboration was self-interested testimony and a single spent casing, the defendant contends the trial court needed to give a "great caution" instruction so that the jury would focus on "the various aspects of the testimony of each co-defendant and evaluate their motives in testifying."

The defendant acknowledges this court has rejected similar arguments. In *State v. Fontenot*, 16-226 (La.App. 3 Cir. 11/2/16), 207 So.3d 589, this court found an accomplice's testimony concerning the defendant's theft of a truck to be sufficiently materially corroborated when the truck was found exactly where the accomplice said it would be. In *State v. Talbert*, 20-251 (La.App. 3 Cir. 2/3/21), 311 So.3d 1100, this court found an accomplice's testimony placing the defendant at the scene of the murder, to which the accomplice accompanied him, was sufficiently corroborated by available evidence, including forensic data matching the types of guns the accomplice

described defendant using, text messages, and cell phone data indicating the defendant was in the area.

In the case before the court, the trial court instructed the jury as follows:

> Now as jurors, you alone determined the weight and credibility of the evidence. As the sole judges of the creditability of witnesses and of the weight their testimony deserves you should scrutinize carefully the testimony and circumstances under which each witness testified. In evaluating the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about what he or she testified; his or her manner while testifying; any reason he or she has to testify for or against the state or for or against the defendant in the extent to which the testimony is supported or contradicted by other evidence. If the offers evidence of a statement by the defendant, you must first determine whether that statement was in fact made. You must then consider whether the statement, if made, was accurately recorded or repeated. If you find that the defendant made a statement you must also determine the weight or value that the statement should be accorded, if any. In determining the weight or value to be accorded as a statement made by the defendant you should consider all the circumstances under which the statement was made. In making that determination you should consider whether the statement was made freely and voluntarily without the influence of fear, duress, threats, intimidation, inducement or promises.

> The testimony of a witness may be discredited by showing that the witness will benefit in some way by the defendant's conviction or acquittal or that the witness is prejudice or the witness has some other reason or motive for not telling the truth. The testimony of a witness may be discredited by showing the witness made a prior statement which contradicts or is inconsistent with his present testimony, such prior statements are admitted only to attempt to discredit the witness, not to show that the statements are true. The testimony of a witness may be discredited by showing that the witness previously was convicted of a crime. The conviction does not necessarily mean that the witness is failing to tell the truth, it is a circumstance you may consider along with all the evidence in deciding whether you believe any or all of the person's testimony.

A "great caution" instruction involves testimony from accomplices. Although others were named as co-defendants for the weapons charge, they are not accomplices to the attempted murder charge and may not truly be accomplices to defendant's act of discharging a firearm. In *State v. Hollins*, 08-1033, p. 5 (La. 6/26/09), 15 So.3d 69, 72–73 (alteration in original), the supreme court discussed the meaning of accomplice:

> The is no statutory definition of "accomplice" in our codes or statutes. In Louisiana, parties to a crime are either principals, La. R.S. 14:24, or

8

accessories after the fact. La. R.S. 14:26. This Court first defined an accomplice in 1945 in connection with accomplice testimony as "one who is associated with others in the commission of a crime." *State v. Gunter*, 208 La. 694, 23 So.2d 305, 311 (1945). This fits within the definition of a principal under La. R.S. 14:24, which defines a principal as "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime . . ." As we further stated in *Gunter*, a person can be an accomplice regardless of whether or not he has been convicted of or pled guilty to the crime. *Gunter*, *supra* at 311.

Second, similarly to *Talbert*, the testimony of multiple witnesses in the case before us placed the defendant at the scene of the shooting and indicated he fired a weapon. The firing of the weapon was corroborated by material evidence, a spent casing collected at the site of the gunfight which was fired from an FN firearm belonging to the defendant's mother. After reviewing the testimony and the trial court's instructions, we find the trial court sufficiently cautioned the jury to be aware of the self-interested motives of witnesses, and trial counsel lacked a valid legal basis for requesting a "great caution" jury instruction. Thus, counsel's performance was not deficient under the first prong of the *Strickland* analysis. Accordingly, this claim is without merit.

*Attempted Manslaughter Jury Instruction*

The defendant was convicted of attempted manslaughter. Louisiana Revised Statues 14:31 defines manslaughter:

> A. Manslaughter is:
>
> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
>
> (2) A homicide committed, without any intent to cause death or great bodily harm.

(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or

(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.

(3) When the offender commits or attempts to commit any crime of violence as defined by R.S. 14:2(B), which is part of a continuous sequence of events resulting in the death of a human being where it was foreseeable that the offender's conduct during the commission of the crime could result in death or great bodily harm to a human being, even if the offender has no intent to kill or to inflict great bodily harm. For purposes of this Paragraph, it shall be immaterial whether or not the person who performed the direct act resulting in the death was acting in concert with the offender.

Attempt is defined by La.R.S. 14:27:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

In order to obtain a conviction for attempted manslaughter, the state must prove beyond a reasonable doubt that the defendant possessed the specific intent to kill. *State v. Taylor*, 96-320 (La.App. 3 Cir. 11/6/96), 683 So.2d 1309, *writ denied*, 96-2828 (La. 6/20/97), 695 So.2d 1348. At the close of evidence, the trial court instructed the jury, in part:[5]

Manslaughter, what is manslaughter. That's the killing of a human being when the defendant had the specific intent to kill but it's committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Manslaughter, most people relate to, is someone just loses control and kills someone. In order to convict Mr. Randall of attempted manslaughter you must find that he attempted to kill Markel [sic] Prater, Ronnie [sic] Fox, Jacoby [sic] Fields, that he had a specific

---

[5]Defendant was charged with attempted second degree murder. Responsive verdicts for the offense include attempted manslaughter and aggravated assault with a firearm. La.Code Crim.P. art. 814(4).

intent to kill and that the attempting killing was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. When considering provocation sufficient to deprive an average person of self-control and cool reflection, the law requires that there be some act or series of acts by the victim sufficient to deprive a reasonable person of self-control and cool reflection, provocation shall not reduce a homicide to manslaughter if the jury finds that the offenders [sic] blood had actually cooled or that the average persons [sic] blood would have cooled at the time the offense was committed. In order to obtain a conviction for attempted manslaughter, the state must prove beyond a reasonable doubt that the defendant possessed the specific intent to kill, and the defendant did or omitted an act tending directly toward the attempted killing.

. . . .

A fourth potential on this count is aggravated assault with a firearm. An assault is an attempt to commit a battery, placing someone in fear of bodily harm. A threat that you're going to hurt someone. For the purposes of this section, a firearm is defined as an instrument used in the propulsion of shot, shell or bullets by the action of gun powder exploded within it. In order to obtain a conviction for aggravated battery ...for aggravated assault with a firearm, the state must prove beyond a reasonable doubt that Tyrek Randall placed Markel [sic] Prater, Ronnie [sic] Fox and Jacoby [sic] Fields in reasonable apprehension or fear of bodily harm with a dangerous weapon.

During deliberations, the jury asked the trial court for the definitions of attempted manslaughter and aggravated assault with a firearm. The trial court reinstructed the jury as follows:

Manslaughter is defined under Revised Statute 14:31 as a homicide which would be murder under either Article 30, first degree murder or 30.1 second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offenders blood had actually cooled or that an average person's blood would have cooled at the time the offense was committed or manslaughter is also defined as a homicide committed without any intent to cause death or great bodily harm when the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1 or of any intentional misdemeanor directly effecting [sic] the property. Another part that doesn't apply about resisting lawful arrest, or when offender commits or attempts to commit any crime of violence defined by R.S. 14:2b which is part of a continuance sequence of events resulting in the death of a human being where it is foreseeable that the offenders conduct during the commission of the crime could result in death or great bodily harm to a human being even if the offender has no intent to kill or to inflict great bodily harm. For purposes of this paragraph, it shall be immaterial whether or not the person who

11

performed the direct act resulting in the death was acting in concert with the offender.

. . . .

The attempt part of attempted manslaughter, an attempt is defined in Revised Statute 14:27, any person who has a specific intent to commit a crime does or omits an act for the purpose of intending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended, it shall be immaterial whether under the circumstances he would have actually accomplished his purpose. Mere preparation to commit a crime shall not be sufficient to constitute an attempt, but lying in wait with a dangerous weapon with the intent to commit a crime or searching for the intended victim with a dangerous weapon with the intent to commit a crime shall be sufficient to constitute an attempt to commit the offense intended. You will remember that the attempt is attempted second degree murder or attempted manslaughter or aggravated battery or aggravated assault with a firearm or not guilty on the charge of attempted 2nd degree murder. The definition of aggravated assault with a firearm, as I told you an assault is the threatening or putting someone in fear that you're going to hurt them; I'm going to get you, it puts you in fear, that's an assault, simple assault. An aggravated assault is an assault committed with a firearm, aggravated assault committed with a fireman [sic] instead I am going to threaten you with my hand or a pencil, I threaten you with a firearm. A firearm is defined as an instrument used in the propulsion of shot, shell or bullets by the action of gun powder exploded within it. So that completes those definitions.

The following exchange took place between the court and defense counsel:

BY MR. GUILLOT [defense counsel]:

One thing Judge, can you just remind on the attempted manslaughter still requires specific intent to kill, I don't think that was clear.

BY THE COURT:

Well, the question Mr. Guillot was asking that I read the definition out of the law book…

BY MR. GUILLOT:

That's true.

BY THE COURT:

…and that is exactly what I did.

BY MR. GUILLOT:

That's what you did.

12

BY THE COURT:

Which includes that a homicide committed without any intent to cause death or great bodily harm.

The defendant contends his counsel failed to object to the judge's instruction to the jury as to the responsive verdict of attempted manslaughter. He notes the court responded to the jury's request for the definitions of attempted manslaughter and aggravated assault with a firearm by reading most of the definition of attempted manslaughter as set forth in the statute, except La.R.S. 14:31(A)(2)(b), the resisting arrest subsection. He points out that "When the court read subparagraph (2)(a), the court stated 'or any intentional misdemeanor directly affecting the property' instead of stating 'or any intentional misdemeanor directly affecting the person' as set forth in the statute." He argues this was a crucial difference, because he was charged with shooting at the SUV with Fox, Fields, and Prater inside. Substantial evidence, moreover, was admitted at trial concerning shattered windows and the SUV's multiple bullet holes.

Additionally, the defendant notes his counsel requested that the court remind the jury that attempted manslaughter still required specific intent to kill. The court responded that it had already read the statute from the book as requested by counsel, noting "which [included] that a homicide committed without any intent to cause death or great bodily harm." Counsel thereafter acknowledged that the court had read the definition out of the law book, and that although the attempt instruction was also reread, the court did not clarify that section (A)(1) required a finding of specific intent to kill, or that since the crime at issue was an attempt, specific intent to kill was required under all sections of the statute. The defendant argues, "the court's final comment before the jury left the impression that [he] did not have to possess the intent to kill to be found guilty of attempted manslaughter. No subsequent objection or request for clarification was made."

13

The defendant contends the errors were not harmless. The defendant concludes by arguing his counsel "should have assured the jury was provided the correct definition of manslaughter and . . . informed that specific intent was required as to all provisions of the manslaughter statute because the charge was an attempt to commit the offense."

The state contends Prater and Fields had not pled at the time of defendant's trial, but Fox had pled to a felony and received probation. The state suggests there was overwhelming evidence that Fox, Fields, and Prater were pursued and shot at without provocation, and there was no evidence to contradict Fox and Prater's testimony that they fired into the air after being fired at. "Their" testimony was materially corroborated. Moreover, the jury instructions included language as to witness credibility and the jury being the sole judge in accessing motives or incentives for a witness's testimony.

The defendant relies on *State v. Page*, 96-227 (La.App. 5 Cir. 8/28/96), 680 So.2d 104, *writ denied*, 96-2543 (La. 9/19/97), 701 So.2d 153, to support his arguments. In that case, the fifth circuit addressed an assignment of error wherein the defendant contended that the jury was improperly charged that general intent was a required element of simple burglary and that this error was prejudicial. In its discussion, the fifth circuit stated:

> The Louisiana Supreme Court in *State v. Williamson,* 389 So.2d 1328, 1331 (La.1980), found that an erroneous jury instruction was reviewable, stating:
>
>> . . . it is within the province of this reviewing court to entertain complaint of Constitutional violations on appellate review notwithstanding that consideration of such complaint more often than not is deferred until filing of a writ of habeas corpus. This Court's usual pretermission of such issues stems from the need of an evidentiary hearing which can only be had incident to the writ of habeas corpus. The record before us, however, bears full and sufficient proof of the error which no posterior hearing could augment. For this reason, the need for delay is obviated.

In the case at hand the asserted error involves the very definition of the crime of which defendant was in fact convicted. Such an error is of such importance and significance as to violate fundamental requirements of due process. (Footnote omitted).

*State v. Williamson,* 389 So.2d at 1331.

More recently in *State v. Cavazos,* 610 So.2d 127, 128 (La.1992), *reh. denied* (La.1993), where there was an erroneous instruction regarding the element of intent, the Court found that "a substantial probability that jurors may have convicted a defendant under an incorrect definition of the crime justifies setting aside a conviction on due process grounds even in absence of a contemporaneous objection."

Thus, our jurisprudence provides sufficient authority for review of the alleged erroneous jury charge despite the lack of a contemporaneous objection.

The standard for reviewing jury charges requires that the charges be read as a whole. A verdict will not be set aside because of an objection to a portion of the trial court's charge unless such portion, when considered in connection with the remainder of the charge, is shown to be erroneous and prejudicial. *State v. Broussard,* 202 La. 458, 12 So.2d 218, 220 (La.1942). A trial court charges a jury by presenting to the jury his entire instructions. Thus, any appellate review should always consider the entire presentation. *State v. James,* 95–566 (La.App. 5th Cir.1995), 665 So.2d 581, 583; *State v. Parker,* 506 So.2d 675, 684 (La.App. 5th Cir.), *writ denied sub nom., State v. Tell,* 512 So.2d 456 (La.1987).

*Id.* at 106.

However, in *State v. Hongo*, 96-2060, p. 5 (La. 12/02/97), 706 So.2d 419, 422 (footnote omitted), the supreme court discussed the trial court's improper inclusion of intent to inflict great bodily harm in the definition of attempted second degree murder and concluded:

Because the erroneous instruction at issue may be an irrelevancy and because a reviewing court can make this determination, the error is not structural . . ., but rather a trial error which may or may not have prejudiced defendant and thus is subject to harmless error analysis, or in the case of an ineffective assistance claim, an analysis of whether defendant was prejudiced by the error.

The court then addressed whether counsel was ineffective for failing to object to the erroneous instruction.

The first prong is easily met here as the rule of [*State v.*] *Butler*[, 322 So.2d 189 (La.1975),] is well-established with over twenty years

15

duration and a reasonably competent attorney would know of it and properly object when presented with the instant erroneous instruction.

As to the second prong, whether defendant was harmed or prejudiced by counsel's error . . . . The jury in this case was presented with a binary choice between the state's version of what occurred and the defendant's. The defendant testified that he and the victim were struggling over the gun when it accidentally discharged twice. The State argued and presented sufficient evidence to show that the defendant entered with the intent to kill the victim but failed to complete his plans. *State v. Hongo*, 625 So.2d 610 (La.App. 3d Cir.1993), *writ denied*, 631 So.2d 1163 (La.1994). There was no argument or evidence presented to the jury which would support a finding that the defendant had the intent to only inflict great bodily harm. Indeed, given only the two versions that were presented, no reasonable jury could have concluded that defendant had the intent to only inflict great bodily harm. Thus the court's erroneous inclusion of intent to inflict great bodily harm did not prejudice the defendant, nor would its omission have affected the verdict.

Therefore, because defendant was not prejudiced by his counsel's failure to object, he has failed to satisfy the second prong of an ineffective assistance claim.

The definition of manslaughter was read at the request of defense counsel and included various definitions that were not applicable to the evidence presented and the misstatement at issue. Defense counsel did not object to the misstatement, which may be a deficient act. However, in light of *Hongo*, we find the defendant's claim lacks merit. The evidence presented; defendant's request for special jury instructions, which addressed justifiable homicide, stand your ground, the aggressor doctrine, defense of others, and transferred justification; and the court's original jury charges in no way reflect that defendant was being tried for property damage. Thus, the erroneous statement did not prejudice defendant.

*Objection to Late Appointment or Failure to Request a Continuance of Trial*

The defendant was represented by attorneys Mark Jeansonne and Chad Guillot at different times during the pendency of the case. The trial court allowed Jeansonne to withdraw on November 2, 2023. The defendant stated he would hire counsel, and the trial court told defendant to inform his new counsel that a motion for continuance could be filed, "but in all likelihood it's not going to be granted based on this supreme

16

court law." The court also told the defendant that the state had given notice that his case was first on the trial docket for November 13, 2023. The defendant subsequently indicated he would like appointed counsel, and the court appointed the public defender's office to represent the defendant. Guillot represented the defendant at trial.

During trial, there was a discussion regarding the number of statements given by Jekolby Fields. Representation of the defendant was discussed during this time:

BY MR. GUILLOT:

. . . But I had to try this case in 13 days. Thirteen days I had this file, I went at the DA's office to get a copy of the file. I got it on a thumb drive I put it in my computer. And Ms. Jeansonne did not give it to me, that's okay I get it. But now I'm being basically sent ... wait Mr. Salario, let me finish my argument. I'm being sand bagged right here because of things I don't have. And they're jamming me up on it when I'm the one that's been trying to get this get case ready because I know no one wants a continuance on it. And I had to get it ready. And I'm ready but then we have things that come out that are ... that I don't even have.

BY THE COURT:

Well first of all, you had the case more than 13 days because Mark Jeansonne appeared June 22, 2021 and he withdrew on December 15, 2022 at which time the public defender's office was appointed to represent Mr. Randall. And the public defender's office had the file until June 12th, 2023 at which time Mr. Jeansonne re-enrolled. And the records of the court reflect that complete discovery had been provided way back before this statement was provided, the discovery they had as of December of 2021 and also later discovery supplemented by the state and included and supplemented in open court.

. . . .

BY MR. GUILLOT:

Just to be clear everyone in this room knows why I got the file in this case back in 2021 just or whenever it was. Mark Jeansonne withdrew with a purpose of a Motion to Suppress denial and he wanted me to file a writ. That is all I did and Mr. Jeansonne told me and I think he finally told Mr. Salario as well. I can't speak for him but he's going to get back on the case and that's ... all I did in that case before then was do a writ on a very narrow issue.

At the sentencing hearing, the trial court stated:

Randall was initially represented by Attorney Mark Jeansonne from date of arraignment of June 22, 2021, with Mark Jeansonne withdrawing as counsel on December 15, 2022. At that time the Public Defender's Office

17

was appointed to represent Tyrek Randall, with Chad Guillot assuming representation.

On June 12, 2023, Mark Jeansonne again enrolled as counsel for Randall and proceeded to represent Tyrek Randall until he was discharged on November 2, 2023. I make mention of this for some things that will be said later. Prior to discharge as attorney a Motion for Consolidation was filed and granted. All of the pending matters against Tyrek Randall arising from the April 4, 2021, incident were consolidated for trial.

On November 2, 2023, the Public Defender's Office was again appointed to represent Tyrek Randall and Chad Guillot did in fact assume representation of Randall from that date through trial and through this date.

Before getting any further as to the particulars of the case, I do want to note that it is highly anticipated that Tyrek Randall will exercise his constitutional right to appeal his constitutional right to appeal his conviction and appeal his sentence. And it is anticipated during his appeal his appellate counsel which would be appointed by the state Public Defender office will make a claim of ineffective assistance of counsel due to the quick trial date after he discharged his attorney. If this claim is in fact made this court requests that the higher court, that's the court of appeal consider these findings by this court.

First, during his representation of Tyrek Randall, between December 15, 2022, June 12th, 2023 Chad Guillot secured 2 continuances of jury trials based on a writ application that was filed and pursued. A writ application being a partial appeal. Chad Guillot represented Tyrek Randall extremely diligently during this time.

Secondly, on November 2nd, 2023, 11 days prior to trial, Chad Guillot was again appointed to represent this defendant, knowing that this court was not going to grant an 11th continuance. This court had previously noted that this matter had been set for trial 10 separate times and continued on multiple occasions most times at the request of the defendant.

Between November 2nd, 2023 and this date Chad Guillot has represented this defendant in an extremely diligent and professional manner. Mr. Guillot obviously has spent a great deal of time preparing for trial and even during trial on each night, each night during this trial emails were sent to me and to assistant district attorney Salario in advance of filings that were being made the next day. This rarely happens in jury trials that the defense lawyer at night is still working on the case. Pointing out that Mr. Guillot argued various provisions of the proposed jury instructions, raised various issues regarding the self-defense claim, raised an issue of transferred justification. Which had never been raised in this court before and a strong claim made by Mr. Guillot. And also raised the claim of stand your ground laws. During the trials at

night Mr. Guillot prepared and submitted filings for the next day, Motions in Limine concerning anticipated testimony of law enforcement officers and concerning the family of the jury of minimal potential sentences which were issues that most People were not aware of that were going on for the sentence. It is absolutely clear that Chad Guillot put forth a defense for Tyrek Randall that was admirable especially considering the overwhelming evidence against this defendant.

The defendant notes that on November 2, 2023, the court allowed counsel to withdraw, but it instructed defendant that his case was still set for November 13, 2023, since his trial had been set and continued ten times before. Guillot was appointed eleven days prior to the defendant's trial date, and he did not object to the appointment or request a continuance of the trial date after hearing the court's warning that it had no intention to grant one. The defendant contends Guillot should have sought the continuance despite the court's warning.

The defendant contends his case was not straightforward. It involved three separate crimes, with several defendants charged with numerous crimes, several co-defendants offering antagonistic testimony in exchange for plea agreements, and numerous statements by each co-defendant. For these reasons, roughly two weeks was not long enough for his counsel to prepare. He then gives an example of counsel's alleged troubles.

In the middle of trial, defense counsel questioned Jekolby Fields and introduced two statements. He was unaware that Fields had given a third statement that contradicted the first two. The state exploited this mistake on cross and introduced Field's third statement into evidence. The defendant says, "The failure to obtain complete discovery and to have time to assure that the discovery was complete left an impression that defense counsel was hiding information from the jury." He also claims knowledge of the third video would have changed the cross-examination of this witness.

Next, the defendant notes Guillot represented him for a period of about six months and during that time secured two continuances of trial settings due to a writ application, considering this writ application as a partial appeal. The defendant says that application was limited to whether Chief Johnson had authority to investigate and seize evidence in the case and did not address the specific facts of the crimes or what was learned during the unsanctioned investigation, and so the writ did not require appointed counsel to review the evidence in the case to prepare for the writ. Also, the trial court noted that Guillot diligently represented the defendant, including working long hours at night during trial to prepare pleadings to be filed the following days. However, the defendant contends that these long hours were necessitated by the late appointment and that these pleadings would have normally been filed before the trial.

The state suggests Guillot is the Chief Public Defender and is a very experienced criminal defense attorney. Thus, he would have requested a continuance if one was warranted. Moreover, he was familiar with the facts of the case because he was previously involved in the case.

In *State v. Harris*, 14-981 (La.App. 3 Cir. 3/4/15), 157 So.3d 1230, *writ denied*, 15-704 (La. 3/14/16), 189 So.3d 1066, the defendant argued counsel was ineffective because he failed to move for a continuance after new evidence was revealed on the day trial was set.

> The day before testimony began, defense counsel informed the trial court that the state just informed him (the previous day) that Jarrod Guin would be testifying at trial. Defense counsel objected to Mr. Guin's testimony based upon the timing. The state replied that it had just been informed by Mr. Guin's attorney that Mr. Guin had information concerning the case. In fact, the state did not see Mr. Guin's video statement until it was watched for the first time with defense counsel. . . .
>
> Here, the trial court allowed Mr. Guin's testimony, commenting on the nature of the testimony and also reasoning that weather conditions would cause a later start after jury selection. The court also indicated that defense counsel would have time to talk to an investigator, tell the court his needs, and, he could determine the start time for trial the following day. Thus, it is possible that trial counsel did, in fact, have time to investigate the matter. It is also possible that trial counsel chose not to

20

ask for a continuance for some other tactical reason. Accordingly, it is not possible, based on the record before this court, to determine whether trial counsel's failure to ask for a continuance constituted ineffective assistance of counsel:

> Decisions relating to investigation, preparation, and strategy require an evidentiary hearing and cannot possibly be reviewed on appeal. Only in an evidentiary hearing in the district court, where the defendant could present evidence beyond that contained in the instant record, could these allegations be sufficiently investigated. Accordingly, the defendant's claims of ineffective assistance of counsel will be relegated to post-conviction relief.

> *State v. Mitchell*, 13–426, pp. 28–29 (La.App. 3 Cir. 11/6/13), 125 So.3d 586, 605, *writ denied*, 14–102 (La.6/20/14), 141 So.3d 807. Similarly, here, we find that the defendant's ineffective assistance of counsel claim in this assignment of error should be relegated to post-conviction relief.

*Id.* at 1245-46.

We find this issue should be relegated to post-conviction relief wherein it can be determined how prepared defense counsel was to proceed to trial and why he did not request a continuance.

*Discussion With Jury During Deliberations*

During deliberations and after the jury had been reinstructed, the court advised the jury that it had received three videos showing defendant's mother had improper contact with one or more jurors while the jurors were waiting their turn for the restroom. According to the court, one video depicted "one of you while she's talking, sign of the cross, and turns and walks away, just like that, clearly uncomfortable." The court described another video, "Michael you're leaning outside and she walks by you and says something to you on the outside."[6] The court then asked if any juror would like to speak to it about the incident privately or if any juror felt uncomfortable. Juror Theresa Anderson requested to speak with the court in private. Anderson informed the court that she saw defendant's mother crying outside the restroom and told her to pray. She heard the woman continue to talk, but did not hear what she said

---

[6]There was indication by the court who Michael was.

21

or know who she was talking to. Anderson confirmed she felt comfortable remaining on the jury. After speaking with Anderson, the court again asked the jury whether any of them felt uncomfortable going forward and "reaching a verdict based on the law and evidence regardless of" the events that occurred. None said that they were uncomfortable.

The defendant notes the court did not individually speak to the jurors that were identified on the videos. He contends that when it did speak to the jury about defendant's mother, the timing was improper. The defendant suggests the discussion with the jury occurred after jury instructions were concluded, the jury was sent to deliberate, the alternate jurors were dismissed, and defense counsel provided the court with two defense exhibits. It was at this point in time that the court told the parties there was a video it wanted them to watch. The defendant says the court was therefore aware of the alleged impropriety before the beginning of deliberation but did not address it until after deliberations had begun. Additionally, the defendant contends that when the court finally addressed the jury regarding this matter, it should have commented in a manner to limit undue prejudice, but it instead stated what the videos depicted, and, in the discussion with Anderson, elaborated about the mother's actions which Anderson had not seen or heard.

Ultimately, the defendant contends his counsel provided ineffective assistance when he failed to object to the court's questioning of the jury and the court's characterizations of defendant's mother and when he failed to request a mistrial.

The state avers the issue was brought to the court's attention by the bailiff, and, thereafter, the parties met in the judge's chambers and agreed that the jurors would be questioned about whether they interacted with defendant's mother. The state suggests the court's handling of the matter was proper.

Although the trial court informed the parties there was a video it wanted them to watch, there is no indication on the record how the court became aware of the

22

videos depicting the interaction at issue, when the trial court became aware of the videos, or that the video mentioned by the court was in fact one of the three at issue. The defendant's arguments are based on an assumption. Moreover, the state suggests the parties agreed, in chambers, to the court's questioning of jurors about their interaction with defendant's mother, and that conversation is not in the record. Based on the lack of information in the record, we find these issues are better addressed via post-conviction relief wherein an evidentiary hearing may be held.

*Victim Impact Statements*

Here, the defendant contends that counsel provided ineffective assistance at sentencing because he failed to object to the trial court's use of victim impact evidence regarding the death of Stephon Moore.

At the sentencing hearing, the court considered letters from friends and relatives of the defendant and stated:

Some of the comments made in these letters must be noted:

1) Tyrek is a quiet young man, first time father, very respectful and serves his community.

2) This was an unfortunate mistake for which Tyrek is generally remorseful.

3) Tyrek recognizes the gravity of his actions[.]

4) Tyrek deeply regrets the mistakes he has made.

5) These are unfortunate allegations Tyrek has been accused of.

6) Tyrek trusted the wrong crowd.

7) Tyrek is aware of the mistake and is remorseful.

8) Tyrek is deeply affected and very remorseful.

9) Tyrek is incredibly remorseful and has made efforts to make amends to the victims and to the Court.

10) This was a childish mistake.

These letters are making claims that are very new to this Court. At no point during the pendency of these proceedings, which have occurred over a period more than two years, has this Court received any indication that Tyrek Randall was remorseful; that he recognized the gravity of his actions; regretted any mistake that he has made; and especially, there has been no indication that he has made efforts to make amends to the victims and to the Court. What his friends refer to as a "childish mistake" is simply wrong.

Next I reviewed the file of the Avoyelles Parish District Attorney's Office which indicated there was one statements [sic] including one by Tyrek Randall indicating that he was not present at all during this incident. The evidence confirmed otherwise.

Next I reviewed the pre-sentence investigation report completed by the Department of Probation and Parole which is being submitted for submission to department of corrections as required by law.

This abbreviated report is important because of the statements made by Tyrek Randall and his mother. Tyrek provided the following statement:

"I wish none of this stuff would have occurred from the get go. Innocent people could have got hurt. I regret that the shooting happened." This statement is nothing short of amazing. Tyrek Randall states that, "innocent people could have got hurt," when it appears that an innocent person lost his life. Yes, innocent people - - - the passengers in the car and/or people in the neighborhood could have been hurt also.

Latisha Benjamin, the mother of Tyrek Randall provided the following comments:

"My son Tyrek Randall would never hurt anyone. He is not a criminal nor pose any threat to anyone. He is twenty-two years old and has no criminal record. Tyrek has never been in trouble. Tyrek has expressed regret for his actions involving this incident."

Once again, amazing statements. In this Court's interaction with Tyrek over the years, including in juvenile matters, it has been extremely evident that Tyrek has a hard time functioning without his mother. His mother has always seemed to be in complete control of his life. The comments of his mother provided to the Probation and Parole Office are simply amazing, unless Tyrek has expressed regret for his actions to his mother. He certainly has not expressed regret to the family of Stephen Mooe [sic] nor to this Court not to anyone. Further, while Ms. Benjamin indicates that Tyrek would never hurt anyone, why would he be carrying a gun? Why would he fire a gun at individuals driving in a vehicle? Certainly not for any reason other than to cause harm. This report is being filed as Court Exhibit No. 2.

. . . .

So the court next looked at Sentencing Guidelines set forth certain sentencing guidelines set forth in 894.1 of the Code of Criminal Procedure. These guidelines are for judges to follow in sentencing. There are certain aggravating circumstances that apply.

a)      The conduct of Tyrek Randall during the commission of the offense of Attempted Manslaughter manifest deliberate cruelty to the three victims.

b)      Tyrek Randall knowingly created a risk of death or great bodily harm to more than one person.

c)      Tyrek Randall used actual violence in the commission of the offense of Attempted Manslaughter.

d)      The offense resulted in a significant economic loss to the owner of the vehicle which received several gun shots and also, in all probability, the offense resulted in the death of Stephen [sic] Moore.

e)      Tyrek Randall used a dangerous weapon, that being a gun, in the commission of the offense.

f)      Very importantly, the offense of Attempted Manslaughter in this case involved multiple victims, that being three in number, for which separate sentences have not been imposed. Had the District Attorney could have chosen Tyrek Randall with three separate counts of Attempted Murder, he could be facing three separate sentencing [sic] for these three counts instead of just one.

g)      Tyrek Randall used a firearm while committing the offense, and this firearm, by its very nature, involves a substantial risk of the use of physical force.

In considering mitigating circumstances, the following are found to apply:

a)      Tyrek Randall has no history of criminal activity and only one minor instance of juvenile delinquency.

b)      The imprisonment of Tyrek Randall may cause hardship to his child, if in fact he is helping to financially support this child.

The consideration of these factors as set forth in Article 894.1 clearly reflect that this Court should impose a sentence of imprisonment being that there appears an undue risk that during any period of a suspended sentence or probation, Tyrek Randall may be involved in similar offenses and is therefore in need of correctional treatment or a custodial environment that can be most effectively by his commitment to an institution. Any lessor sentence than that issued herein would deprecate or lessen the seriousness of the crimes committed by Tyrek Randall.

Next the court looked at similar cases reviewed by our higher courts. Most importantly noted that many years ago the maximum for manslaughter was 21 years and attempted manslaughter was 10.5. In State vs Boyd, 681 So2d 396 a 20 year sentence for attempted manslaughter was upheld, which is the current maximum. With the higher court stating maximum and minimum sentences for attempted manslaughter had been affirmed in many cases. Including *State v. Alexander*, *State vs Solomon*, *State vs. Palmer*, *State v. Guidry*. All ten and ten and a half year sentences have been the maximum for manslaughter was 21 and attempted was 10.5.

In 1992, when the statute was amended to increase the maximum penalty for Manslaughter from twenty-one to forty years, almost doubling it. In State vs Boyd the defendant was sentenced to serve the maximum because the court found that the facts actually supported a conviction for attempted murder. When the court supported the imposition of the maximum with reasons from the sentencing guidelines. Also in State vs Ates, 989 So2d 259 a 16 year sentence was imposed and found to be constitutional when a defendant discharged a weapon at one person while attempting to commit a crime. In this case it's certainly feasible that the facts could have supported a conviction for three counts of attempted murder. It noted that cases wherein the maximum sentence has been imposed, that occurred and have been upheld where the defendant has had extensive criminal records, including dangerous crimes. Or cases where the defendant was charged with another violent crime along with attempted manslaughter. In this case Mr. Randall does not have an extensive criminal record.

Next the court will look at letters from family and friends of Stephon Moore. Noting in reading each one that the jury did not find beyond a reasonable doubt that Tyrek Randall committed negligent homicide concerning the death of Stephon Moore. However Stephan [sic] Moore did die that night from a gunshot wound.

At the time of his death Stephen [sic] Moore was twenty-two years old and as per this Court's recollection of Stephen [sic] and the photographs submitted to the Court was an extremely good-looking young man. In reviewing the Obituary and the funeral proceedings, it is obvious that Stephen [sic] had a tremendous send off to heaven. However, it is undisputed that this send off occurred much too early in his life.

This Court has received and reviewed various letters from family members and friends of Stephen [sic] Moore. These letters are being filed as Court Exhibit No. 3. Some of the comments are notable.

1)      Stephen [sic] was the life of the party. Full of love. He could dance his butt off. He was known as the "jigging king."

2)      Stephen's [sic] daughter will never have her dad again.

3)      Stephen [sic] was his mom's best friend.

4) Stephen [sic] was the life of the party.

5) His death at such a young age impacted so many people.

6) You don't know how much of a downfall it is that he can't see his sister become captain of the dance team at Texas Southern University or how his little brother grew up to be a handsome young man.

Concerning other comments as to the event, here are some pertinent comments:

1) I vividly remember the horror of that night. What were his last words? His half-brother knows and will not tell us.

2) I am full of sorrow but also furious. These were Stephen's [sic] so-called friends.

3) Stephen's [sic] so-called friends get to walk freely like they don't know what happened when they left him for dead.

I did not know until preparing for sentencing that Tyrek Randall and Stephon Moore were half brothers [sic].

4) This has been a profound emotional hardship on the entire family and another devastating aftermath of gun violence.

5) We want Tyrek to tell the truth.

6) These letters, especially a letter from Stephen's [sic] mother, are very compelling. As I've said this Court was not aware that Tyrek and Stephen [sic] were half-brothers. This Court was not aware that they had been raised together and were extremely close friends. This Court was also not aware of allegations that Latisha Benjamin, Tyrek's mother, paid people to move Stephen's [sic] body; deleted video footage from ring cameras; and paid people to keep quiet. These allegations are very serious, and it would not be surprising to this Court if this did in fact occur considering the behavior of Latisha Benjamin throughout these proceedings.

Also I got a letter last night that says:

7) "Hey we need to make a few more arrests on Stephon Moore [sic] case they have the people that was [sic] accessory to [sic] the fact such as Stephanie Laurent, Jarvis Moore's mother, Eric Huddleston (who assist [sic] LaTisha Benjamin) who moved Stephon's body, Charlie Hager, Charlie Hill [sic] wife Stephanie or right y'all had something to do with my son [sic] murder Huddleston moved Stephon [sic] body then hid the body and she went bought [sic] them boys home to simmesport [sic]."

Again these are all just allegations but where is this information coming from? Because everybody has been so concerned about what really happened that night.

And the last comment that I'm going to make although there are many others, I could forever on [sic] both sides concerning the letters.

8) There is no punishment that can fill the void of his loss of Stephen [sic].

This Court was not aware that Latisha Benjamin called Stephen's [sic] mother after Stephen's [sic] body was found and asked her, "where's my baby?" When, at the same time there appears to be compelling evidence that Latisha Benjamin was aware of what had already occurred.

This Court was not aware that Latisha Benjamin forwarded text messages to the mother of Stephen [sic] Moore providing all kinds of stories trying to get her to believe that someone else had taken Stephen's [sic] life. Stephen's [sic] mother asked Latisha Benjamin to let her know what happened to her baby, from mother to mother with Latisha Benjamin responding that she was served a Warrant for interfering with the investigation. The impact that this incident has had upon the mother of Stephen [sic] Moore, who was her first born child, is obvious and overwhelming and considering the fact that she sits everyday [sic] and still not knowing the truth is overwhelming.

So what really and truly happened on the evening of April 4, 2021, on Martin Luther King Drive in Cottonport, Louisiana will probably never be known. Various individuals involved in the incident testified, however, there is no doubt that none of the witnesses provided a full, complete, and honest version of the incident. Tyrek Randall exercised his right not to testify, and therefore, we will never know what version he would have provided. According to the testimony of the mother of Stephen [sic] Moore's child, Tyrek Randall gave multiple versions as to his whereabouts and/or involvement in the incident, eventually admitting to being the one who shot and killed Stephen [sic] Moore, although accidentally.

Before speaking about the evidence submitted at Trial, this Court must note that prior to Trial this Court approved, what is obviously now, a very defense favorable plea agreement. The defendant rejected it, which is his right. Had this Court been aware of the actual evidence as produced at Trial, this plea agreement would not have been approved.

There are many things that the evidence revealed that were totally undisputed and very important when considering sentence. The evidence is undisputed that on April 4, 2021, Jekolby Fields was driving his mother's vehicle with Marquelle Prater in the front passenger seat and Roney Fox in the rear passenger seat. They were in a line of cars that passed in front of Tyrek Randall's grandmother's home, Patricia Randall. One witness testified to Roney Fox flashing money out of the window. No other witness testified to any incident between the occupants of the

vehicle and the individuals standing with Tyrek Randall at his grandmother's home.

For some unexplained reason, Tyrek Randall and his friends proceeded to travel through a cut in a person's properties and appearing on or near the roadway where the Jekolby Fields vehicle was proceeding. For another unexplained reason, they had guns in their possession. For another unexplained reason, they began to fire guns at the vehicle, striking the vehicle on more than twelve occasions. Shooting at a vehicle with people inside of the vehicle clearly reflects to this Court an intent to kill the people in the vehicle. Guns are made to kill. When an individual points a gun at a person and pulls the trigger, the intent to kill is evident. However, for some reason the Jury returned the responsive verdict of Attempted Manslaughter.

The evidence submitted at Trial is also undisputed as to the fact that Tyrek Randall claimed self-defense even though the evidence was undisputed that he, along with his friends, chased the vehicle for no apparent reason. Many stories have arisen in idle talk during the pendency of these proceedings, including a claim that Randall and his friends were running after a car full of girls who had been twerking at them when they passed in front of Tyrek Randall's grandmother's house. Even if this did in fact occur, for what reason were they chasing these girls with guns? For what reason would they then open fire on the Jekolby Fields vehicle? There is absolutely no explanation, in fact nor in law to justify their behavior. Luckily, the occupants of the Jekolby Fields vehicle did not sustain serious injuries. Unfortunately, one of the individuals with Tyrek Randall, namely Stephen [sic] Moore, was shot in the head and killed. A senseless unjustified killing. Who actually shot and killed Stephen [sic] Moore and how this actually occurred is not and probably will not be known. This is truly sad for the family of Stephen [sic] Moore. They deserve to know what happened. Especially when you consider that Tyrek Randall told the mother of Stephen [sic] Moore's child that he accidentally shot and killed Stephen [sic] Moore. Did this in fact occur? Was Stephen [sic] Moore struck by another bullet? In this Court's opinion, the family deserves closure.

It must be noted that Tyrek Randall has not accepted any responsibility nor shown any remorse for his actions. The evidence submitted at Trial was overwhelming and undisputed that he had a gun in his possession and shot the gun on the streets of Cottonport, Louisiana, along with other individuals. Why in the world did Tyrek Randall have a gun in his possession? Why would he believe that the use of guns was necessary in this incident? Maybe it is exactly as stated by Assistant District Attorney, Anthony Salario - - - it was like Tyrek Randall believed he was playing a video game.

Our society is filled with shootings, all senseless in nature. Guns are made for one purpose, and that is to kill. Guns are not meant to be toys. Guns are not to be played with. Young men shooting guns at a vehicle with people inside the vehicle constitutes senseless acts. There is no reason as to why the conduct of Tyrek Randall justifies a lenient sentence, other than the fact that his family loves him and will miss him.

> This defendant committed horrible, senseless acts with no explanation whatsoever. This Court expected there to be some type of evidence submitted as to why this incident happened. However, absolutely no such competent evidence has been received. This was simply a senseless brutal act committed without any justification whatsoever. These senseless shootings must stop. Unless these young people who commit the shootings receive serious sentences for these offenses, these shootings will simply continue.

The court then stated when imposing the maximum sentence for attempted manslaughter:

> noting that this is the maximum sentence which is usually reserved for those who have long criminal records; but in this case based on the reasons that I have set forth herein, and the fact that in this courts' [sic] estimation of the evidence there is no could have been, should have been 3 counts of attempted second degree murder this is the proper sentence.

The defendant filed a motion to reconsider sentence. Therein, counsel noted maximum sentences were imposed, the trial court stated the defendant was not remorseful although he apologized in the pre-sentence investigation report, and police found only one casing from a weapon owned by his mother. The defendant further noted the trial court considered evidence regarding Stephon's death, and he did not object out of respect for Stephon's family and his belief that it would not be used in imposing the sentences. However, he argues this evidence should not have been considered, and it was abundantly clear the circumstances surrounding Stephon's death were considered in determining defendant's sentences.

At the hearing on the motion to reconsider sentence, defendant was sworn and was questioned by the court. Therein, the defendant stated:

> Basically the day the incident occurred I was behind my grandma's house and a vehicle kept circling around, I don't know specifically who was in the vehicle because I was in the back yard. And my grandma's backyard is set up like you can be in the back yard but like you can see the vehicle passing. So like the third time the vehicle ended up passing. We was [sic] going to talk to some girls on the back street. And in the process of going talk [sic] to some girls on the back street I was still in the backyard when they went across. So I was the last person to go across the cut side of the street. And when I did cross the street to go up to the girls and them, shooting and stuff started to happen. So I … shooting and stuff happened, I didn't know where shots and stuff was [sic] coming from. And then that [sic] I had a firearm on me, I just was shooting back.

30

And so when I did … to the probation officer basically called and asked me whether I was … I said I was sorry the incident, that's what I was referring to was the shooting at the vehicle not knowing you know, specifically who was shooting at me or whatever. And basically just had a ... and approximately with all that going on it had [sic] vehicles behind each other like in trails and then basically I was standing like in the (INAUDIBLE) I did. And that's basically what I was referring to. But as far as Stephan [sic] if I was [sic] to tell you everybody I saw with that, I'd be lying. Because specifically I really don't know what happened to him. Because I was not around, I was in Marksville. Whenever I found out, I found out that Stephan [sic] was dead April 5th, the next morning when my mom called me and told me. When my mom called me and told me I called my cousin and asked them [sic] what happened specifically. And he said he didn't know.

The defendant then said he watched Stephon run down the street in a different direction, and the defendant got in his vehicle and left. He denied speaking to Stephon's girlfriend about the death. The defendant said he had his mother's gun because he had been shot at before and wanted to protect himself. He admitted firing one shot. The trial court subsequently denied the motion, stating:

The Motion to Reconsider, the court gave ample thought prior to sentencing. What I clearly anticipated to happen, based on the evidence presented where he could have been found guilty of attempted murder, if the jury had found that and something that was potential. Had it come in with all these ... the family of Stephan [sic] Moore here and stood up and said this is what happened and say I lost my brother and during this incident and things might have been different. But it is not. So I've got to go with what's before the court. And it's insufficient for me to reconsider the sentence so the motion is denied.

The defendant contends counsel was ineffective for failing to object to the trial court's consideration of victim impact statements regarding Stephon's death considering this information was contrary to the jury's verdict and the trial court did not indicate that the evidence was considered because the evidence of guilt of negligent homicide was overwhelming. The defendant also suggests the trial court relied on unsubstantiated comments made by Stephon's family members to conclude his death occurred during the gunfight. He argues this conclusion was contrary to testimony presented at trial. The defendant further suggests the trial court's comments at the hearing on the motion to reconsider indicated he was punished for

exercising his right to remain silent and to a trial and that he was being punished for not providing information about Stephon's death. Thus, counsel was ineffective.

The state alleges that Stephon Moore's designated family member had the right to make a victim impact statement under La.R.S. 46:1844(K) despite the fact that defendant was found not guilty. Louisiana Revised Statutes 46:1844(K) provides:

> K. Right of victim or designated family member to be present and heard at all critical stages of the proceedings.
>
> (1)(a) At all critical stages of the prosecution, if the victim or designated family member is present, the court shall determine if the victim or designated family member wishes to make a victim impact statement. If the victim is not present, the court shall ascertain whether the victim or designated family member has requested notification and, if so, whether proper notice has been issued to the victim or designated family member, in accordance with Subsection B of this Section, by the clerk of court or by the district attorney's office. If notice has been requested and proper notice has not been issued, the court shall continue the proceedings until proper notice is issued.
>
> (b) The victim and victim's family members shall have the right to make a written and oral victim impact statement as follows:
>
> (i) Any written statement shall be made available to the state and the defendant and shall be made part of the record. The statement may be submitted by the district attorney upon request of the victim or designated family member. Upon request of the victim or designated family member, any such written statement may be sealed by the court after review by the parties.
>
> (ii) The hearing at which an oral statement is provided to the court shall be subject to the limitations of relevance. In any case where the number of victim's family members exceeds three, the court may limit the in-court statements that it receives from them to a fewer number of statements. The court may otherwise reasonably restrict the oral statement in order to maintain courtroom decorum. The defendant must be present for the victim impact statement, and the court shall not prohibit the statement from being directed toward the defendant, unless the statement disturbs the order and decorum of the courtroom. Upon motion of the state, the court may hear any such statement in camera.
>
> (2) The statement of the victim or the victim's family may:
>
> (a) Identify the victim of the offense.
>
> (b) Itemize any economic loss that has been or may be reasonably suffered by the victim as a result of the offense.

(c) Identify any physical injury suffered by the victim as a result of the offense, along with its seriousness and permanence.

(d) Describe any change in the victim's personal welfare or familial relationships as a result of the offense.

(e) Identify any request for medical or counseling services needed by the victim or the victim's family as a result of the offense.

(f) Contain any other information related to the impact of the offense upon the victim or the victim's family that the trial court requires.

(g) Contain any other information that the victim or victim's family wishes to share with the court regarding the overall effect of the crime upon the victim and the victim's family.

(3)(a) Prior to the sentencing hearing, the court shall provide the counsel for the defendant, the victim, and the attorney for the state with notice of the maximum and minimum sentence allowed by law. The court shall allow the victim, or designated family member, and the prosecutor the opportunity to review any presentence investigation reports that have been prepared relating to the victim's case. The review of the presentence report shall be conducted under the supervision of the court.

(b) At the sentencing hearing, the court shall afford the counsel for the defendant, the attorney for the state, and the victim or designated family member an opportunity to comment upon matters relating to the appropriate sentence. Before imposing sentence, the court shall verify that the victim or designated family member was notified of the sentencing hearing and address the victim or designated family member personally, if the victim or designated family member is present at the sentencing hearing, to determine if the victim or designated family member wishes to present a written and oral impact statement pursuant to this Chapter.

In *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633 (1997), the Supreme Court addressed the interaction of the federal sentencing guidelines and the Double Jeopardy Clause and held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as the conduct has been proved by a preponderance of the evidence." *Id*. at 156–57. Also, the Louisiana Supreme Court has stated that a trial judge "may properly consider evidence of other offenses in determination of sentence where there is a showing that the defendant did in fact perpetuate the other offense." *State v. Pierson*, 296 So.2d 324, 325 (La.1974). In *State v. Berry*, 630 So.2d 1330 (La.App. 4 Cir.

1993), the fourth circuit addressed the defendant's claim that the trial court should not have considered his arrests for charges for which he was acquitted or never tried and the testimony at the sentencing hearing which implicated the defendant in crimes for which he had never been arrested. The fourth circuit further noted:

> At the sentencing hearing, the state first introduced the testimony from the trial which resulted in the defendant's acquittals. This trial involved two victims; the defendant was charged with aggravated rape and armed robbery of each. The state then called Detective Lido Schaubhut of the New Orleans Police Department rape investigation section. He testified that the defendant had been arrested for eleven aggravated rapes, one attempted rape, seven armed robberies, three aggravated burglaries, two aggravated kidnappings, one simple kidnapping, three aggravated crimes against nature, and one aggravated battery. Detective Schaubhut described the victims, the areas wherein the crimes occurred, and the types of weapons involved. He described the evidence which caused the police to link the defendant to these myriad crimes. This evidence consisted of stolen jewelry pawned by the defendant, fingerprints at crime locations, and at least one identification. However, of the evidence discussed, some of it pertained to the offenses for which the defendant was acquitted.

> Finally, Detective Schaubhut testified on cross-examination that the identical factor among the cases was that the perpetrator was a black male between 25 and 28 years old.

> In *State v. Perkins*, 568 So.2d 610, 612 (La.App. 4th Cir.1990), we stated what use may be made of prior arrests:

>> A court may properly consider prior arrests and police reports in sentencing a defendant. *State v. Soco*, 508 So.2d 915, 917 (La.App. 4 Cir.1987). However, a trial judge does not have "unbridled authority" to consider prior arrests when the defendant may have been innocent of those charges. *State v. Gleason*, 533 So.2d 1032, 1033 (La.App. 4 Cir.1988).

>> The primary factor to be considered is whether there were aggravating factors in the present offense. *State v. Willis*, 452 So.2d 796, 797 (La.App. 4 Cir.1984). In the instant case, the judge found the aggravating factors in a different case, one in which the defendant had been arrested, but not convicted. A court cannot rely on allegations as to the factual circumstances of other offenses of which a defendant has not been convicted in order to find that the present crime for which the defendant is being sentenced was aggravated or severe.

In *Perkins*, the trial court referred to other crimes for which the defendant had been charged but not convicted, specifically, a crime against an

34

elderly woman. The victim in the case for which he was being sentenced was not elderly.

However, the Louisiana Supreme Court held that a trial court could consider unadjudicated criminal activity in sentencing. In *State v. Washington*, 414 So.2d 313 (La.1982), the trial court considered the confession of defendant's co-conspirator as evidence of prior criminal activity. The Supreme Court held that the trial court did not err in doing so:

> The sources of information from which a sentencing court may draw are extensive, and traditional rules of evidence are not bars to consideration of otherwise relevant information. *State v. Douglas*, 389 So.2d 1263 (La.1980). Prior criminal activity is one of the factors under art. 894.1 to be considered by the trial judge in sentencing a defendant. Prior criminal activity is not limited to convictions. *State v. Brown*, 410 So.2d 1043 (La.1982).

*Washington* at 315.

In *State v. Bouie*, 532 So.2d 791, 793 (La.App. 4th Cir.1988), we reiterated that a trial court may consider both arrests and convictions in imposing sentence, provided the defendant "is given notice of the information and is afforded a chance to speak in mitigation."

In the present matter, the trial court made no particular references to the defendant's acts toward any victims except the victim in the instant case. The trial court specifically began his reasons for sentencing by stating "I'm sentencing the defendant today on armed robbery and nothing else." However, the court went on to distinguish between being found not guilty in a trial, which means that the jury is not convinced beyond a reasonable doubt of guilt, and innocence of a crime. The court further stated that he would consider the defendant's "problems" with the law as a tool in making his sentencing decision. As noted above, the court considered the defendant's history of criminal activity, including juvenile matters, and the testimony it had heard at both of the defendant's trials, as well as the testimony regarding the crimes for which the defendant was not tried. The defendant's counsel participated extensively in the sentencing hearing, including cross-examining the witness as to the evidence which purported to link the defendant to other crimes.

The trial court was justified in imposing the maximum sentence. The trial court heard testimony from three victims regarding rapes and robberies. *While the jury was not convinced of the defendant's guilt beyond a reasonable doubt, the trial court clearly was. As long as there was a preponderance of the evidence against the defendant, the trial court could consider these other offenses in sentencing the defendant.* Furthermore, as to the victim in this offense, the jury did not acquit the defendant of aggravated rape but rather was unable to reach a verdict. The trial court, having heard the victim's unequivocal testimony that she was raped as well as robbed, could consider this as an aggravating factor in sentencing.

The trial court did consider the impact of Stephon's death as a factor in sentencing the defendant. Though the jury rendered a verdict of not guilty to the charge of negligent homicide, the trial court found that "in all probability, the offense [attempted manslaughter] resulted in the death of Stephen [sic] Moore." The trial court clearly found that, while the exact circumstances of Stephon's death were not proven at trial, the chain of events that led to Stephon's death began when the defendant pursued the SUV and began shooting at its occupants. Thus, we find that evidence related to the impact of the defendant's role in the death of Stephon to Stephon's family were properly considered by the trial court in sentencing the defendant. We find, therefore, that defense counsel's failure to object to the introduction of this evidence does not constitute ineffective assistance of counsel.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, defendant contends that his maximum sentences are constitutionally excessive. As part of his argument, the defendant notes the court's consideration of Stephon Moore's death and the letters from his friends and family even though the jury found him not guilty of negligent homicide. The defendant further suggests that Stephon was not a "victim" of the offenses for which he was sentenced. Therefore, he argues the victim impact evidence before the trial court was irrelevant to assessing the severity of the defendant's convictions. The defendant made the same arguments in his motion to reconsider sentence filed with the trial court, thus it is properly raised before this court.

We have already determined that the trial court did not commit error in considering the statements made at the sentencing hearing. Nevertheless, we will review the sentences imposed for constitutional excessiveness.

This court, in *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042–43 (alteration in original), *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, enunciated the standard to be used in reviewing excessive sentence claims:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99), 746 So.2d 124, *writ denied*, 00–0165 (La.6/30/00), 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

In *State v. Soileau*, 13-770, 13-771, p. 5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005–06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261, we stated:

> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, writ denied, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:
>
>> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir. 1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, 958.

In *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writ denied*, 07-320 (La. 11/9/07), 967 So.2d 496, *and writ denied*, 07-1116 (La. 12/7/07), 969 So.2d

626, this court adopted the fifth circuit's three factor test from *State v. Lisotta*, 726 So.2d 57.

The defendant was charged with attempted second degree murder and found guilty of the responsive verdict of attempted manslaughter. The trial court sentenced him to the maximum sentence, twenty years. He was also charged with illegal use of weapons or dangerous instrumentalities and found guilty as charged. The trial court sentenced him to the maximum sentence, two years, to be served concurrently with the sentence for attempted manslaughter. The defendant participated in a gunfight in a residential area on Easter Sunday, firing a weapon at a moving vehicle with three occupants inside, any of whom could have been injured. Police found fourteen bullet holes in the vehicle. As a consequence of this event, Stephon Moore died, though it is unclear who shot him.

The defendant is a first-time felony offender. In its reasons for ruling, the trial court indicated that the defendant had "only one minor instance of juvenile delinquency." In mitigation, the trial court noted that the defendant had a small child, who may suffer hardship because of his father's inability to financially support him.

We turn now to a review of the jurisprudence for similar crimes. In *State v. Monceaux*, 12-599 (La.App. 11/7/12), 118 So.3d 22, this court found no abuse of discretion in the trial court's sentence of the defendant to a maximum sentence of twenty years after he pled guilty to attempted manslaughter. Mr. Monceaux was sixty-five years old at the time of the offense, and was originally charged with attempted first degree murder. He was a first-time offender who targeted his wife, and failed to succeed in killing her only because his gun misfired.

In *State v. Boyd*, 95-1248 (La.App. 4 Cir. 8/29/96), 681 So.2d 396, the fourth circuit affirmed a twenty-year sentence for attempted manslaughter where the defendant was a first-felony offender. The trial court in that case cited the use of a

dangerous weapon in the commission of the crime and the fact that there were potentially multiple victims.

In the case before us, the defendant showed a disregard for human life by engaging in a gun fight in a residential area and shooting at a moving vehicle with three occupants. One person, the defendant's half-brother, was shot and died as a result of this exchange of gunfire. We find the trial court did not abuse its discretion in sentencing the defendant to the maximum sentences for attempted manslaughter and illegal use of a weapon, and the sentences are not constitutionally excessive.

## CONCLUSION

The defendant's convictions and sentences are affirmed.

**AFFIRMED.**

# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 24-340 consolidated with 24-339


**STATE OF LOUISIANA**

**VERSUS**

**TYREK RANDALL**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2021-CR-226994-B
HONORABLE WILLIAM BENNETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.


**AFFIRMED.**

Annette Fuller Roach
Louisiana Appellate Project
P. O. Box 6547
Lake Charles, LA 70606-6547
(337) 436-2900
COUNSEL FOR DEFENDANT- APPELLANT:
	Tyrek Randall

Charles A. Riddle, III
District Attorney, 12th JDC
Anthony F. Salario
Assistant District Attorney
P. O. Box 1200
Marksville, LA 71351
(318) 253-6587
COUNSEL FOR APPELLEE:
	State of Louisiana

**PICKETT, Chief Judge.**

For the reasons assigned in *State v. Randall*, 24-339 (La.App. 3 Cir. 2/5/25), ___ So.3d ___, the convictions and sentences of the defendant, Tyrek Randall, are affirmed.

**AFFIRMED.**